Next matter is Mylan Pharmaceuticals v. Smithkline. Mr. Johnson, good morning. Good morning, your honors. Michael Johnson for the appellant, Mylan. If it pleases the court, I have requested three minutes to be reserved for rebuttal. In this case, Mylan seeks enforcement of the agreement that it negotiated and that the parties agreed to. That agreement does not permit the defendant appellee, GSK, to do what it has done here, namely supply Paxil-CR, the antidepressant product that's at issue in this case, to another generic pharmaceutical company to license, excuse me, to market and sell to downstream customers. And the district court here erred by not considering the extrinsic evidence, including trade usage of terms. Your honor, that is one of the points of error and one of the reasons why the district court decision must be reversed. Under controlling New Jersey law, the construction of an agreement, even if it appears on its face to be unambiguous, requires the consideration of extrinsic evidence of the party's intent, the circumstances surrounding the negotiation of the contract, and of course the course of the negotiations of the contract. But it still can't modify an unambiguous agreement, is that correct? Your honor, even where the language on its face appears to be unambiguous, the New Jersey Supreme Court has made clear that you must consider that to inform what the meaning is. The words that appear on the face of the agreement itself, the New Jersey Supreme Court has held, are not always determinative. Now of course, your honor... But what if they are determinative? What if it's crystal clear, absolutely no differences of opinion? Isn't that enough? Absolutely, your honor. There are going to be instances, and there certainly are instances, in which the words that the parties used actually embody their intent, and it's a black and white issue. For example, were Mylan to be alleging here that the product, the authorized generic of Paxil-CR, could only be sold 10 years after Mylan launched its agreement, even though the agreement says two years, that would be an issue where extrinsic evidence would not serve to inform the meaning of the agreement. But here, your honors... And the judge said that. Then the judge has considered whether extrinsic evidence would be helpful, and said it's not helpful, so I'm not going to look at it. That's correct. Isn't that what Judge Pisano did here? No, your honor. The judge did that in some instances, but in construing the agreement itself, in divining what the intent of the parties was, the district court judge did not, in fact, explicitly say, I've considered Mylan, the non-movance evidence, and I don't find it to be illuminating as to what these parties meant here. In the context of construing those words in that section of the agreement, that information wasn't considered. But regardless, your honors, because this is de novo review, the grant of a summary judgment motion, whether or not the district court judge actually considered it, the evidence is here today. The record is in front of you, your honors. And the record is very clear that the parties did intend here a meeting entirely consistent with the actual words in this Second Amendment to the Patent, License, and Settlement Agreement. Judge Erika mentioned trade usage. Did he consider trade usage when divining at this decision? Your honor, he used the trade usage information in the context, I believe, of considering the implied covenant of good faith and fair dealing claim, but not in Mylan's breach of contract claim. With marketing and selling interpretation. Pardon me, your honor? With the interpretation of marketing and selling. The trade usage information does go to what the meaning of marketing and selling is. And that information was presented by Mylan. It took the form of an expert report prepared by a pharmaceutical marketing executive with many years in the business, both with generic products and with brand products. And that evidence showed that marketing and selling of an AG product denotes to people knowledgeable in the industry activities that are targeted to moving the product closer to the end user, down the supply chain, not activities directed to an entity like Apotex, another pharmaceutical company that sit at the same level of the supply chain. Let me see if I understand. For the first two years, while there's exclusivity, if there is a patent infringement suit brought by GSK, it can settle that. And in so doing, allow that third party, and this is in the first paragraph of TUI, allow that third party, if that third party, I assume, has filed an ANDA, to go ahead and market and sell the authorized generic. Is that correct? Yes, your honor. After two years, you're saying that the marketing and selling has to be by GSK or an affiliate, and Judge Pisano here is saying, okay, they sold it, GSK or the affiliate, sold it to the third party here. There we go. Try it again. After two years, they can sell it to anybody they want. And you're saying, no, that's not correct, that's not the way it's understood, because, in effect, what, they sold it, they didn't really market it, and what was contemplated is that they would market and sell to persons down the chain, but not another branded company. Is that correct? That's a fairly good synopsis of what Mylan's argument is in respect to what we call the second exception that's in that second paragraph. The evidence clearly shows, and we think the language itself shows, that the parties intended that it would be GSK or its affiliate that would be doing the marketing and selling of the AG product. And you're saying you can't really separate the marketing and selling, and I guess Judge Pisano said it's really marketing or selling? Well, Your Honor, actually, Judge Pisano recognized that the appellee, GSK, had made an argument that you should divorce those words and, in essence, cross out the word and and insert the word or, but he declined to do that, which was probably the right decision. He went on then, Judge Pisano, to conclude that, in fact, GSK has both marketed and sold. That was another point of error, really a separate and independent point of error. Even setting aside his erroneous construction that they can market and sell to whomever they want, the finding then that GSK here, on this record, on summary judgment, only supported the conclusion that it has marketed and sold is really unsustainable. The conclusion was based on Judge Pisano's opinion that the inclusion of this product in a portfolio of products that were conveyed by GSK to Apotex as part of a settlement was marketing activity. And, Your Honors, on its face, I would submit that that is a dubious conclusion. That is a matter of law. One can conclude that the inclusion of a product in a portfolio of products that are part of a package of settlement consideration is marketing. Just to understand, so marketing and selling, as you, I believe, stated before, is sort of a downstream, down to, let's say, pharmacies? Ultimately, yes, Your Honor. Okay, so GSK could provide the generic form of Paxil to pharmacies who, in turn, can sell to consumers. Yes, Your Honor. That's not a problem. Yes, Your Honor. The problem is with the drugs going to a competitor, Apotex, which could do the same thing as GSK and the same thing as your client. Right, Your Honor. In the first part of your question, I assume that you meant that in giving it to the pharmacy, in your hypothetical, you meant they were going to be actually marketing and selling it. They were going to be engaging in the activities that are described in the agreement. They would fill the prescriptions. But GSK would be required, if it were to be trying to take advantage of this, what we call the second exception, it would be required to market and sell the product to that pharmaceutical company. And the pharmaceutical company then could, or excuse me, I meant to say the retail pharmacy, that retail pharmacy then could use whatever means are appropriate for it, in turn, to get it into the hands of the consumer. To fill the prescriptions, yes. Yes. That's okay. That would be okay, Your Honor, but that is not what has happened here. The record evidence shows that GSK would never have done that, or it's very unlikely that it would have done that, because it is not practiced in the means of moving products to downstream customers. Your problem then is a marketing and selling to a third party. It's marketing and selling to a pharmaceutical company at the same level in the supply chain as GSK and Mylan. That is the issue that we have with the language. And the evidence, respectfully, shows that our interpretation is supported by the industry understanding of what that phrase means. The word sell, I mean, doesn't that have a fairly generous connotation? Your Honor, the phrase has to be construed together as, you know, an aggregate whole, and marketing and selling are buzzwords, sort of like frolic and detour in our business. Marketing and selling are the words that pharmaceutical individuals knowledgeable in the pharmaceutical business use to denote what you're doing to move the product down the supply chain. It's not what you do if you have a relationship with one of your competitors where we're going to help each other out. That's not marketing and selling. That's dealing with your competitor here. Actually, I guess I'm getting to the merits of the problem, because your argument is that the district court should have allowed all of this, the extrinsic evidence, before you even get to that point. Absolutely, Your Honor. The district court could very well have arrived at the decision that it made had it considered the extrinsic evidence. Your Honor, respectfully, I think that the district court would not have arrived at the same conclusion it did, because we think the evidence supports our case. But our argument is, of course, we think that this should really be going to a jury. You know, Milan is, of course, only looking for its day in court. It's not looking for that. Before that, it should go back to the district court to consider extrinsic evidence. The district court construction would, I mean, it's our position on this appeal that the evidence would not support a finding that the interpretation that GSK has espoused is the only reasonable interpretation. At a minimum. Do you want us to interpret the contract? Your Honors, this court need only consider whether Milan has put forward at least a reasonable interpretation of this agreement. Taking account, yes, of the extrinsic evidence that's in the record. But it doesn't require that this court determine as between alternate reasonable interpretations, which is the correct one. But as a fallback position, would you be, well, I know the answer to this. I think you do, Your Honor. You didn't quite answer Judge Fuente's question as to whether Judge Pisano should consider the extrinsic evidence before sending it to the jury. Whoops. I think I understand that. We have, you know, there are other matters that I think we ought to deal with as well. Maybe the good faith will give you some more time. But also, at the end of it, I'd like to hear you on the damages because I think I see some problems there, particularly in the admission that is made pre-trial. And I understand that apparently there's some evidence that GSK, when they've been in these situations before, have not sold directly downstream but have contracted with other generics to do so. But do you? Your Honor, I'd be happy to address the damages issue. Why don't you deal with the good faith? Okay, Your Honor. The district court erred as well in granting summary judgment in respect of Milan's breach of the covenant of good faith and fair dealing claim. The purpose of that claim is, of course, to protect the deal that the parties struck and to protect the non-movement's interest in getting the benefit of that bargain. Here, the district court essentially discounted Milan's evidence as to what the parties intended at the time of contracting. That is, that GSK would only be permitted to market and sell to downstream customers and it would not be permitted to supply another generic company with the product to be sold in competition with Milan. But isn't that just a legitimate interpretation of the contract? No, Your Honor. It's not a legitimate interpretation of the contract because it did fail to take account of the extrinsic evidence. The district court judge essentially ruled that the evidence that would be necessary to show what is the benefit that's to be protected by the implied covenant can't be considered at all because that evidence is somehow at odds with what the district court judge thought was the unambiguous meaning of the language of the agreement. And, Your Honors, were that always the case, a district court would never be able to take account of evidence of what is this benefit of the bargain. The analysis would simply start and end with what the district court thinks the plain meaning is of the words of the contract. In essence, the error is very similar to the error in the context of the breach of contract claim. The district court simply failed to take account of extrinsic evidence when it should have done so. A quick question. In the original agreement, there was a provision concerning material modifications. Does that provision continue on into the modification? Does that have any role in the amendment? Yes, Your Honor. The amendment itself provides that. I do see there was a material modification. Yes. Right, the amendment itself provides that all terms that aren't specifically amended in the amendment continue forward so that there was a provision. I think you're referring to an Article 7 of the original agreement. Well, I was referring to the change in the economic value because obviously the amendment changes the economic value that you bargain for. I thought you were arguing that, you know, therefore that provision was. You're right, Your Honor. One of the defects in the district court opinion is that it would effect, if the district court opinion were allowed to stand and its judgment were allowed to stand, it would effect a very, very material economic change in the party's positions because rather than Milan simply facing the prospect of competition by GSK or one of its corporate affiliates, instead Milan would face competition by Apotex and any other generic company that's in the market. Obviously the universe of potential competitors is opened up dramatically by the district court opinion. That creates an unnecessary tension within the document because this amendment was negotiated in the context of a term in the original agreement that said, if you were going to amend this agreement because of FTC review, which is what happened here, the parties need only enter into an amendment if it's not going to change the economics of the deal to the parties. And that's what happens under the district court opinion. You get rid of that tension if you go and you accept Milan's interpretation as a reasonable one because the universe of potential competitors is narrowed significantly so that you do not see this material impact that's caused by the construction adopted by the district court. On damages, Your Honor, that is a fact-intensive inquiry. It's one that the district court judge here did not even reach. And it's certainly not a basis for summary judgment in this case. Milan has adduced expert evidence in the form of a damages report by its expert that basically opines that Milan has suffered tens of millions of dollars of damages as a result of the unlawful conduct of GSK and Apotex. GSK takes the position, well, we have an alternative factual scenario where we don't think that you have suffered any damages even if we, GSK, compete lawfully. But that is an alternative factual scenario that they have proposed. Their own expert at her deposition testified that any consideration of a but-for hypothetical damages scenario must take account of the record evidence. And here, Milan has adduced substantial record evidence to show that the but-for hypothetical damages scenario posited by GSK is insupportable. First, GSK posits that it was going to compete directly in the generic market. But the evidence is clear. GSK has admitted that it has never itself engaged in this type of marketing and selling activity of a generic product. It's also admitted that it does not have a subsidiary to do that, nor does it have any current plans to have a subsidiary to market and sell the AG of the Paxil-CR product. And lastly, GSK has posited a scenario in which it would engage a sales agent. And we don't even really know what the sales agent is. What the record does show is that there has only been one instance in which GSK worked with a sales agent to try to launch an authorized generic product. I deposed a witness who was involved in that program, and she testified that the program was a failure and that GSK suspended it after only one year. This record, Your Honors, simply does not allow the conclusion that competition by GSK that conforms with the agreement under Milan's interpretation would have resulted in the precise same harm as has actually resulted from the unlawful competition by Apotex here. So, Your Honors, respectfully, damages is simply not a basis upon which summary judgment can be granted. Thank you, Your Honors. Thank you very much, Mr. Johnson. Mr. Mizzo or Mizzo? Mizzo. Good morning. Good morning. Chris Mizzo from Kirkland & Ellis representing the GSK accolades. This case is about a single sentence in a contract negotiated between sophisticated parties. All of Milan's arguments... Second paragraph of 2E. Yes. We have a case called Sumitomo from 08, I guess, or 96, 96, I guess it is, where we said that under New Jersey law, it's clear that even if a contract on its face is unambiguous, you can introduce extrinsic evidence to try to show that there was a completely different understanding. Has New Jersey law changed since 96? No, Judge Ambrose. In fact, the law has been the same since 1953 in the Schwimmer case, which was set forth by the New Jersey Supreme Court. And in that case, the court said that the pole star of contract interpretation is to determine the party's intention by looking at the actual written language in the contract and that extrinsic evidence has a limited role. Sure, you have to consider it, but you can only consider it to the extent that it shows an intention as reflected by the actual words that are used in the contract. You cannot use it to modify, curtail, or enlarge the text of the contract. And if there's evidence of an intent that's not expressed, then that evidence is irrelevant. It seemed that Sumitomo, which was based in part on the 1979 case of Kearney for the New Jersey Supreme Court, says, look, you look at a number of things. You can look at the contractual provisions. You look at the circumstances leading up to the negotiations. You look at custom and usage. You look at the interpretation placed on the disputed provision by the party's conduct. And that's what your opponent is trying to do here. And it would seem that the court has to deal with extrinsic evidence here and just can't ignore it. I agree that the district court can't ignore it, that the district court has to consider it. I think what's important is that we step back, look at the decision, and recognize that the district court actually considered the extrinsic evidence in this case. Do you consider the extrinsic evidence concerning marketing and selling or the expert report that Mr. Johnson's client offered? Yes, Judge Fuentes. As you remarked during my colleague's opening remarks, at A13 of the decision, he refers to industry custom, and that is within the context of the breach of contract. What is A13, appendix? No, yes, it's part of the appendix and it's part of the decision. How about the decision? I have the decision. Sure, sure. The page is page nine of the decision. All right. The comment on the Mylan site is extrinsic evidence which cannot be used? It's the second full paragraph. Next, Mylan asserts that GSK is not selling authorized generic Paxil CR as contemplated by Section 2E to support its argument. Mylan explains that according to the, quote, common industry understanding, close quote, and then it goes on to say that you cannot use an industry understanding to modify the express language of an agreement, which this court held in Dun & Bradstreet v. Grace Consulting and International Union v. Skinner. It says that the common industry understanding cannot be used to create an ambiguity where none exists. That's correct. And so let's, the first part. But it's not putting the cart before the horse? The answer is I don't believe so. This demonstrates that he considered the experts' industry understanding as to the phrase market. He kept coming back to, I mean, the theme of the district court opinion was that this is so unambiguous that I don't go any further is the way I read it, and you're saying that's not the case? I don't believe that is the case. I believe in this case at A5, which is the first page of this decision, he expressly states he considered the party's submissions. By itself, under New Jersey law, that should be sufficient. But he then goes on to analyze the extrinsic evidence. He does it on A13 with regard to the common industry understanding or purported common industry understanding because there's not a shred of evidence in the record to support this industry understanding. But you do have these, you know, updates from Mizell and maybe one other person who's basically saying, here's how you understand marketing and selling. I'm going to come back only to another point that your opponents made, and that is that when you look at the first paragraph of 2E, it talks about during the exclusivity period, if there is an infringement suit brought by GSK and a settlement in connection with a generic manufacturer who has filed for an ANDA that you can, and that party is referred to as a third party, you can settle and allow them to sell. The second paragraph, the one that you're focusing on, says GSK or its affiliate. It doesn't use the word or any third party. That would have been obviously the thing that nails this shut. And yet, not only does the first paragraph use the word third party, but the supply and distribution agreement on page A, I think 699, specifically says that the GSK or its affiliate or any third party can sell in a particular territory. If the word third party has been used in other contexts and is not used in this key sentence that you're talking about, then don't I have to look outside at extrinsic evidence, even if the, it's not so unambiguous anymore, is it? I think the language is unambiguous. Why is the word or any third party not used there? If you were drafting this again, you and I both would have put or any third party in there. You wouldn't be standing up here today if it was in there. Knowing what I know today and how this litigation unfolded, absolutely. But I don't believe it needs to be any clearer because if you take Mylan's argument to its logical extreme, that means GSK cannot sell to any third party. It has to sell directly to patients. It has to open up drugstores on every corner, and that could not possibly have been the intent that is reflected in what is actually written. GSK had a well-established practice of selling AGs to generic companies. Mylan knew about this. It admits as much as page 9. And there, when you asked the request for admission, they said that they didn't know about this as of the time, of the relevant time, and I guess 2010, 2011. I believe at page 9 of the reply brief they can see that they were aware that GSK had such a practice, and now they're trying to attempt to argue that it is actually consistent with their interpretation of the agreement. I'm looking at appendix 1120. They say that they were not aware as of September 27, 2007, of GSK having sold authorized generics directly, that is, through an affiliate or subsidiary to pharmacy change. We're saying the same thing, Judge. That is an RFA where they said that they are unaware of GSK doing anything other than their standard practice, i.e., they've never heard of GSK selling to a wholesaler, retail, or pharmacy chain, which is what they argue the interpretation should be. Rather, as reflected in page 9 of their reply brief, they were aware that GSK had sold to generic companies, and that's the only way it had ever sold an AG. You may be right on all of this, but at this stage, don't you have to consider extrinsic evidence? Don't you have to consider and deal with a custom and usage? I think the judge did. I think the district court did deal with custom and usage. It looked at it, and it found that you could not use it. What evidence did you put in as to what the custom and usage was, other than the fact, I guess, you're saying that GSK had sold to branded competitors in the past? Is that it? There is that, Your Honor. There's also the FTC negotiations and the fact that the FTC had indicated that it was likely to investigate this agreement absent some sort of modification. The parties? That doesn't go to custom and usage? Yeah. But it's consistent with GSK always selling an AG to generic companies. Custom and usage is tradition. Go back to Judge Ambrose's point, though. The only expert testimony he had with respect to custom and usage was the expert testimony of Mylan. The completely unsupported divorce from the facts of the case testimony from Mylan's expert, I agree, which is that A1255 through 56 is his expert report. You'll see he doesn't cite anything to support his industry understanding. In his deposition testimony at A2605 through 07. He's an expert in the field. But at A2605 through 07, I asked him, did you rely on any evidence from this case? No. He didn't rely on any documents from GSK, no documents from Mylan, no industry publications, no industry standards. He didn't talk to anyone in the industry. But you didn't present an expert report yourself to say that Mylan's expert analysis and opinion are totally incorrect. On their face, Your Honor, I would say it's incorrect because the plain and ordinary meaning of sell is well established. It's the passing of title from the seller to the buyer at a price. That's New Jersey law. It is clear within the context of the original agreement as part of the GSK-Mylan Supply and Distribution Agreement that GSK sells to Mylan, a generic company. That is a meaning of sell that is within the express language of the original agreement. And there's nothing to suggest that they meant anything different in this Second Amendment. With regard to the first paragraph of Paragraph 2E that Judge Ambrose referred to earlier, that deals with a completely different scenario and a different product. Paragraph 1 deals with a generic company being able to sell a generic drug under an ANDA. That is not an authorized generic. An authorized generic, which is defined for the first time in the second paragraph, is the drug that GSK can sell under its NDA. These are two different drugs that have two different triggers. They deal with two different scenarios. So the fact that GSK could have licensed a generic company six months after Mylan launched to sell its generic drug under its ANDA has nothing to do with GSK's ability to sell an AG, nor are there any limitations that restrict GSK from being able to sell. But if you look again back to the second paragraph, GSK or its affiliate may commence marketing and selling. And what happened here is, and it doesn't say or any third party, GSK is not marketing. It's merely selling as part of a settlement agreement with Apotex. So I keep coming back, you know, again, maybe you win, but if you're just selling and you're not marketing and selling, and it's really the third party in this case, Apotex, that's doing the marketing and selling ultimately, why aren't they allowed to bring in the evidence that may show contrary to what you're arguing to the district court? Because the contract is unambiguous, Your Honor. I'm not reading it that way. With regard to marketing and selling, there is nothing that says that GSK must market and must sell. It can market, it can sell, it can market and sell. There is nothing that suggests that you should interpret and as requiring both. In fact, within the section of the patent license, Section 2, there is in Section 2C a reference to Mylan having the right to make, have made, sell, have sold, and import into the United States a generic version. Mylan's in-house and 30B6 counsel testified that and in that case can be treated as an or. Isn't your interpretation of marketing and selling undercut by the first agreement that you entered into with Mylan that said you would not enter into a transaction that would affect Mylan's economic value? And I'm glad you raised that, Judge Fuentes. The answer is no. I think there are several responses to that, which is the first thing is that that provision simply doesn't apply to this amendment. The provision regarding no material change to the economic value of the transactions only applies if you get a negative response. Mylan has always insisted, and the record is you did get a negative response, and that's why you entered into the amendment. Your Honor, Mylan has always insisted from day one that the parties never received a negative response. That is at A1574 and A1583. Rather, Mylan insisted it not be treated as a negative response, but it be characterized as a resubmission not under Section 7C, but under Section 7D. And they only did so in order to acquire a second 30-day period for FTC review. Further, I think any reading of the Second Amendment that suggests that it did not change the value is not giving the plain and ordinary meaning to this language that it should have. In fact, Mylan concedes that its interpretation is unreasonable when in its reply brief at page 16 and in its blue brief at page 50, it argues that the district court's interpretation would curtail its exclusivity by six years. That is contrary to GSK's standard practice, the negotiations before the FTC, and the plain language of this agreement, which limited it to two years. If Your Honors would like me to address the covenant of good faith and fair dealing or harm, I'd be happy to do so. Otherwise, I'd be happy to rest on the briefs. Thank you. Thank you. Good. Thank you very much. Mr. Abraham. Good morning, Judge. Good morning, Judge. My name is Eric Abraham. I represent the Apotex defendants in this case. I must confess I feel a little bit like the tail on the dog. The briefing and Your Honors. You'd rather be the tail on the dog. Yeah, it's always nice to go under the radar sometimes. I agree, Judge. Much of the intellectual work by this court is obviously focused on the breach of contract issue. I have my colleague who's addressed that, and I don't intend to revisit those subjects because in many respects the allegations against Apotex were properly dismissed, irrespective of the resolution of the breach of contract issues. What knowledge did you have? Apotex learned not enough to impose liability. What Apotex learned was that there was an agreement, that there was a royalty payment, that there was a confidentiality provision within that agreement that precluded GSK from actually handing the agreement over to Apotex during the settlement negotiations. You never saw it. That's correct, sir. This isn't a case of willful blindness, however, because once Apotex learned of the existence of this agreement, it took steps carefully designed by experienced negotiating counsel to address the lack of knowledge about the specifics of the agreement, specifically requesting and receiving specific representations and warranties by GSK. You asked for a copy of the agreement? Yes, sir. You didn't get one. Yes, sir. And the specific reason that the agreement was not provided was because of the confidentiality provisions in it. In essence, Apotex was placed in the position of relying upon the representation and warranty by GSK, that there was nothing about the supply and distribution agreement between GSK and Apotex that was in any way inconsistent with the terms of the Milan and GSK agreement. Now, one might wonder, was it reasonable for Apotex to actually accept that representation and warranty, and should it have asked maybe a third or a fourth time and been buffed a third or a fourth time? And the answer to that question was provided to me by the vice president and general counsel of Milan when I deposed him. He was the individual who actually signed the second amendment between GSK and Milan, and his testimony was straightforward and simple. When a party receives that type of a representation or a warranty from its counterparty in a negotiation, it's entitled to rely upon it. Apotex did precisely what Milan's own attorney said was reasonable. With that type of representation and warranty, the conduct of Apotex simply does not rise to the level of, let's call it wrongfulness, that the law in New Jersey requires for a tortious interference claim to stick. You have a situation where obviously Milan and Apotex are competitors, and the law in New Jersey creates a heightened standard for conduct in that circumstance. And when we look at the cases and we look at the examples in the restatement, you see things like physical violence, misrepresentations, abusive legal process. None of those factors are present here. You have a party, Apotex, who didn't even seek out the license for the paroxetine-authorized generic. It wanted cash, and a lot of it. And GSK wanted to settle a very contentious litigation and didn't want to hand over quite that much cash, and therefore offered to Apotex the license for paroxetine, essentially as a way to create a stream of revenue or stream of income to meet what Apotex's bottom line requirements were for the settlement. And under New Jersey law, that is not sufficient to meet the requirements for tortious interference. So we respectfully submit to Your Honors that irrespective of the resolution of this issue, which is clearly troubling to the Court on the Second Amendment and whether or not it was breached, summary judgment was properly granted by Judge Pisano with respect to Apotex. Thank you, Justice. Thank you very much, Mr. O'Brien. Mr. Johnson? Thank you, Your Honors. I'd like to start just by noting that I did misspeak during the first part of my argument when I was discussing at what point in the opinion Judge Pisano rejected Milan's custom and practice evidence. It was in the context of the breach of contract claim. However, Judge Pisano only considered it, and actually did not consider it, but simply rejected it when he was discussing the meaning of the word selling. The broader point here, Your Honors, is that page 9 of Judge Pisano's decision, which is Appendix 13. But the broader point here, Your Honors, is that the position that GSK has taken here, that this agreement is unambiguous on its face such that extrinsic evidence cannot be considered, cannot be sustained. The words marketing and selling are critically important, of course, to this dispute. Unlike the word affiliate, those words are not defined. It is not a position that can be maintained where those words are not defined, and they are used in the context of a specific industry. Evidence as to the meaning of those undefined words in this particular industry can simply be rejected. And we don't know all the evidence that Judge Pisano considered, but we do know that he looked at that expert report and he said, I'm not going to give it any weight. That has to be error as a matter of law. It is further an error as a matter of law that Judge Pisano decided then, having rejected evidence as to the meaning of that undefined term marketing, went on then to construe the evidence as a matter of law against the non-movement. And he concluded that the settling of antitrust claims constitutes marketing, again, without having to find what marketing is. And Judge Pisano did not address Milan's evidence, at least not in the opinion. Milan's evidence, which goes counter to the conclusion that GSK has ever done any marketing. In fact, the agreement that GSK and Apotex entered into in respect to this product specifically says it's Apotex that is solely responsible for the marketing of this product. Moreover, that agreement, again, the appellee's own words describe what they think marketing means. None of those words include settling antitrust claims. And there is other evidence in the record, Your Honors, that GSK and Apotex's own witnesses don't know that GSK has ever done any marketing of the AG of Paxil CR. The record is replete with factual issues. They were not addressed by the district court. Those issues really must be returned to the district court for a jury to consider at trial. Any other questions? Thank you, Mr. Johnson. The case was extremely well argued by all sides. The court would like to have a transcript made of the argument, and it will aid us in drafting the opinion. And I'd ask the lawyers to share the cost of that, please. And if you would just stop by the clerk's office on your way out, we'll tell you how to do all of that. Half and half or a third? Well, I think we should go a third. A third, a third on that. Thank you, Your Honors.